UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RICO OMAR COX,<br><br>Defendant. | Case No: 0:22-cv-61024-SMITH/ MAYNARD |

**PLAINTIFF CFTC'S MOTION FOR FINAL JUDGMENT UPON DEFAULT, AND APPLICATION FOR A PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANT RICO OMAR COX**

Pursuant to Federal Rule of Civil Procedure (Fed. R. Civ. P.) 55(b) and Local Rule 7.1(a)(1)(E), Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") hereby requests the entry of a default judgement against Defendant Rico Omar Cox ("Cox").

### I. PROCEDURAL HISTORY

On May 31, 2022, the Commission filed its Complaint [Doc. #1] against Defendant Cox seeking injunctive and other equitable relief for violations of certain provisions of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1-26. The Complaint (Doc. #1) alleges that beginning in at least December 2019 and continuing through the filing of this lawsuit on May 31, 2022, Cox was operating a fraudulent scheme where he solicited and accepted funds for participation in a commodity pool ("Pool") and proceeded to lose some of those funds trading and misappropriated the majority of those funds for his personal use. In furtherance of his scheme, the Complaint alleges that Cox made fraudulent and material misrepresentations to his

1

Pool participants and/ or he omitted material facts from his Pool participants, related to the use of participants' funds and the profits and balances of the Pool.

On June 9, 2022, Cox was personally served with a copy of the summons and Complaint pursuant to Fed. R. Civ. P. 4e(2)(A). [Doc. #12][1]  On June 28, 2022, Defendant Cox filed an Answer and Affirmative Defenses to the Complaint. [Doc. #6] On June 29, 2022, Defendant Cox filed a *pro se* Notice of Appearance in this case and requested that all future notices be sent for service to: 1641 SW 4th Ave., Fort Lauderdale, FL, 33315. [Doc. #8]

On July 19, 2022, the Plaintiff CFTC filed a Motion to Strike Defendant's Answer and Affirmative Defenses. [Doc. #13]  A copy of said Motion was served upon the Defendant by mailing a copy to him at his address, 1641 SW 4th Ave., Fort Lauderdale, FL 33315.  As a courtesy, a copy was also sent to him electronically at roc86negron@hotmail.com.  [Doc. #13, Page 9 of 9] On December 6, 2022, the Court entered a paperless order granting Plaintiff's Motion to Strike Defendant's Answer and Affirmative Defenses for non-compliance with F.R.C.P. 8(b) and 8(c).  Defendant was further ordered to file a compliant Answer to Plaintiff's Complaint on or before December 30, 2022.  [Doc. #23]  The email of this paperless order indicates that the Clerk's office delivered Notice of this Order to Cox by U.S. mail at his address, 1641 SW 4th Ave., Fort Lauderdale, FL, 33315.  [Doc. #23, email attached as Exhibit A, hereto]

On December 8, 2022, former Commission attorney Cristina Covarrubias and Commission Senior Investigator Joseph Patrick participated in a phone call with Defendant Cox to discuss recent court orders in this matter.  During that call, Attorney Covarrubias asked Defendant Cox whether he knew that the Court had entered an order granting the CFTC's Motion to Strike his Answer to the CFTC's complaint.   Cox said he had not seen the order and

---

[1] ["Doc."] refers to entries in the court docket.

Covarrubius informed Cox that he was required to file an amended answer on or before December 30, 2022.  Attorney Covarrubius also advised Defendant Cox to contact the court's help desk to arrange to receive the court order via email.  [Exhibit B, attached to [Doc. #27-2], Declaration of Joseph Patrick]

Defendant Cox has failed to file an Answer or otherwise respond by the Court's deadline of December 30, 2022, as required by Fed. R. Civ. P. 12(a)(4), and as ordered by this Court on December 6, 2022 [Doc. #23].  Further, Cox is neither a minor nor an incompetent person.  [Doc. #27-3, Exhibit C, Declaration of Susan B. Padove]  Cox is also not a member of the United States Armed Forces on active duty and, therefore, he is not entitled to the protection of the Service Members Civil Relief Act ("SCRA"), 50 App. U.S.C. § 501 *et seq.* as amended. [Doc. #27-3, Exhibit C, Ex. 1 thereto, Declaration of Susan B. Padove].

On January 9, 2023, the CFTC filed its Request for Entry of Default against Defendant Cox [Doc. #27] pursuant to Fed. R. Civ. P. 55(a).  The Clerk of the Court entered the technical default against Cox on January 9, 2023 [Doc. #30].

Pursuant to Fed. R. Civ. P. 55(b) and Local Rule 7.1(a)(1)(E), the CFTC now submits its Motion for Final Judgment by Default, and asks for relief in the form of a permanent injunction, civil penalties and other statutory and equitable relief against Defendant Cox.

## II.     LEGAL STANDARD FOR ENTRY OF DEFAULT JUDGMENT

Under Rule 55 of the Federal Rules of Civil Procedure, if a defendant fails to plead or otherwise defend against a complaint, the Clerk of the Court may enter a default against that defendant.  Fed. R. Civ. P. 55(a).  Where a default occurs, the plaintiff's well-pled allegations are deemed admitted for purposes of liability.  *Buchanan v. Bowman,* 820 F. 2d 359, 361 (11th Cir. 1987).  Once a default is entered, a plaintiff may seek entry of a default judgment against a

defaulting defendant. Fed. R. Civ. P. 55(b). "[B]efore entering a default judgment for damages, the district court must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought. *Tyco Fire & Sec., LLC v. Alcocer,* 218 F. App'x 860, 863 (11th Cir. 2007)." *Ingraham v. Capital Link Management LLC* No. 22-cv-22691 Bloom, 2022 WL 14813740 at *1 (S.D. Fla. Oct. 25, 2022). "If the Court determines that the defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true. *Nishimatsu Const. Co. v. Houston Nat'l Bank,* 515 F. 2d 1200, 1206 (5th Cir. 1976)." *Ikpe v. Kreative Therapy & Rehab Center, Inc.,* No. 18-23217-cv-Williams, 2019 WL 1369502 *1 (S.D. Fla. Mar. 20, 2019). Further, the grant or denial of a motion for default judgment lies within a district court's sound discretion. *Hamm v. DeKalb County,* 774 F. 2d 1567, 1576 (11th Cir. 1985).

If the court determines that the admitted facts in the Complaint are sufficient to establish liability, a court must then ascertain the appropriate amount of damages and enter final judgment in that amount. *Ikpe* at *2. Damages may only be awarded if the record adequately reflects the basis for the award, which can be shown with submission of detailed affidavits establishing the facts necessary to support entitlement to the damages requested. *PetMed Express, Inc. v. MedPets.com, Inc.,* 336 F. Supp. 2d 1213, 1217 (S.D. Fla. 2004). An evidentiary hearing on the appropriate amount of damages is not required by Rule 55, and it is within the Court's decision to choose whether such a hearing should take place. *SEC v. Smyth,* 420 F. 3d 1225, 1232 n. 13 (11th Cir. 2005); *Ikpe* at *1.

### III.    THE LEGAL STANDARD FOR ENTRY OF A DEFAULT JUDGMENT HAS BEEN SATISFIED

**A.    Defendant was Properly Served and a Technical Default Was Entered**

On December 6, 2022, the Court entered an order striking Defendant Cox' original Answer and ordered him to file a compliant Answer on or before December 30, 2022. [Doc. #23]  Defendant Cox failed to file an Answer or otherwise respond by the Court's deadline of December 30, 2022.  On January 9, 2023, the CFTC filed its Request for Entry of Default against Defendant Cox [Doc. #27].  The Clerk of the Court entered the technical default against Cox on January 9, 2023 [Doc. #30].

**B.    Unchallenged Facts Establish Cox' Fraudulent Conduct in Violation of the Act and Regulations**

**1.    Overview of Cox's Fraud Scheme**

In light of the well-pled facts set forth in the CFTC's Complaint [Doc. #1] and in the attached exhibits, including declarations, documents and excerpts from the Defendant's deposition testimony, the CFTC respectfully submits that the entry of final judgment against the Defendant is warranted in this matter.  Beginning in mid-2019, Defendant Cox launched a fraudulent scheme in which he solicited individuals to invest in commodity futures trading, trading only some of the invested funds and losing most of that money while keeping the rest of the investors' funds for his personal use. [Ex. 3 ¶¶ 1, 3, 19][2] Cox led prospective investors to

---

[2] This motion is supported by the following exhibits:
Exhibit 1 (referred to as "Ex 1") is the declaration of Senior CFTC Investigator, Joseph Patrick and includes Exhibits A through R, including specifically, among others, Exhibit A – the signed declaration of Pool Participant 1, one of Cox's pool participants;
Exhibit 2 ("Ex. 2") is a compilation of excerpts from the deposition of defendant Rico Cox, March 8, 2023
Exhibit 3 ("Ex. 3") is the Complaint filed in this litigation, Docket No. 1, and is referred to as ["Comp."] and refers to specific paragraphs of the Complaint
Exhibit 4 ("Ex. 4") is the Default Final Judgment entered in *CFTC v. Rico Omar Cox* (S.D. Florida, June 1, 2016), Docket No. 13

believe that he would be trading their funds and that he had been so successful at trading that it was his was full-time livelihood. [Ex. 1 Ex. A ¶¶ 5, 6; Ex. 3¶ 34]  In reality, Cox, a convicted felon, [Ex. 1 ¶ 12; Ex. 3 ¶ 12] had been found liable for similar commodities fraud activity in June 2016, had little experience trading commodities with no proven track record, [Ex. 2 at 104:6-15 and 108:6-7] and was not only not registered to trade commodities, but, had been barred from trading for himself or others or from soliciting investments from others by a prior federal court order.  *CFTC v. Rico Omar Cox a/k/a Omar Negron,* S.D. Fla. No. 16-60226-civ-ZLOCH.  [Ex. 4] [Ex. 3 ¶¶ 4, 34] [Ex. 2 at 16:3-7; 12:5-6; 134:5-13]   Cox was never registered with the Commission.  [Ex. 1 ¶ 11][Ex. 2 at 23:23-25] Cox disclosed none of his past to those he solicited in connection with this fraud scheme. [Ex. 1 Ex. A ¶¶ 31-32]

      2.      **Cox's Misrepresentations to Participants and Misappropriation of Participant Funds**

Because of the 2016 CFTC lawsuit, Cox knew that he could not solicit investors or accept investor funds directly.  [Ex. 2 at 15:16-16:7; 12:5-16; Ex. 4 pp. 23, 24]   As a result, Cox 's present scheme was orchestrated through a single individual (referred to herein, and in the Complaint, as "Participant 1" or "Part. 1") with whom he became acquainted at their church congregation. [Ex. 1 Ex. A ¶ 4; Ex. 3 ¶ 20] Cox solicited Participant 1to invest by convincing him that he was a successful full-time trader making a living by trading commodity futures. [Ex. 1 Ex. A ¶¶ 5, 6; Ex. 3¶ 21; Ex. 2 at 185:17-24]  Cox initially accepted a modest investment from Participant 1, and Cox gradually increased the false profits he reported to him.  [Ex.1 Ex. A ¶¶ 8, 9]  Cox also made promises of quick profits.  For instance, he said he could turn a $2000 investment in futures trading into a $1000 profit in one month's time.  [Ex. 1 Ex. A ¶¶ 8, 9; Ex. 3 ¶ 35]  The latter, in turn, became more and more enthused about the investment, resulting in his making increasingly larger investments. [Ex. 1 Ex. A ¶¶ 10-14]

6

By paying out small withdrawals of purported profits to Participant 1, and continuously reporting substantial investment gains to him, Cox convinced this individual that the commodities trading investment was making huge profits. [Ex.1 Ex.A ¶ 15; Ex. 3 ¶ 24] As a result, Participant 1 decided to share his good fortune by soliciting others among his families and friends to join him by also investing with Cox. [Ex. 1 Ex. A ¶ 15-16] [Ex. 3 ¶¶ 25, 26] A total of 14 pool participants, including Participant 1 and his family and friends, became investors with Cox. [Ex. 1 ¶ 39 and Table 6] Most of these additional pool participants gave their funds to Participant 1 who then forwarded them to accounts as Cox directed. [Ex. 3 ¶ 27]

To convince Participant 1 that he and the other participants were making money and that they should invest more, Cox would send false futures commission merchant ("FCM") [3] statements of account to Participant 1. For instance, on January 31, 2020, Cox sent Participant 1 a purported statement from an FCM showing a balance of $190,394.42 in a Smart Edge account. The statement was false in that Smart Edge never had an account at this FCM. [Ex. 1 ¶ 45 and Ex. A at ¶ 19 and Ex. P] When asked during testimony if he had fabricated this FCM statement in order to lead Participant 1 to believe that Smart Edge had an FCM account with a balance of over $190,000 in January 2020, Cox's testimony was as follows:

> Cox: I'm going to be honest with you guys. Yes, I did.
> Q: Okay. And why did you do that?
> Cox: I don't remember exactly why at that time.
> Q: Was that to entice [PARTICIPANT 1] into investing with you?
> A: I'm not sure. More than likely.

[Ex. 2 at 183:14-25]

Initially, Cox told Participant 1 to fund his investment by sending money to Cox's personal bank account. [Ex. 1 Ex. A ¶¶ 8, 12, 14] However, since Cox was prohibited from

---

[3] An FCM is a registered entity that solicits or accepts orders to buy or sell futures contracts and receives money from customers to support such orders.

accepting investor funds because of the 2016 permanent injunction in the CFTC's 2016 action [Ex. 2 16:3-7], Cox presumably told Participant 1 that his future deposits, and deposits from additional investors, had to go to bank accounts in the name of Cox's wife, Jennifer Cox ("J. Cox") or in the name of Smart Edge Investments, LLC ("Smart Edge"), an entity owned by J. Cox but controlled by Cox who also controlled Smart Edge's bank accounts. [Ex. 3 ¶¶ 22-23, 13, 24, 27; Ex. 2 at 70:7-11; 80:21-25; 98:19-23; Ex. 1-Ex. A ¶ 27]

Cox also concealed his connection to futures trading activity (as this was also prohibited by the 2016 injunction). Neither Cox nor Smart Edge had futures trading accounts at any futures commission merchants ("FCMs"). [Ex. 1 ¶ 15 and Ex. 1-Ex. A ¶¶ 15-16] Eventually, Cox convinced Participant 1 to set up a trading account in his own name through which Cox would do the trading behind the scenes. [Ex. 1 ¶¶ 17, 18; Ex.1-Ex. A ¶¶ 28-30; Ex. 3 ¶ 28; Ex. 2 at 224:14-16] Cox told him that he needed to set up this trading account in order to increase the number of commodities that he could trade and, thus, increase their alleged profits. [Ex.1 Ex. A ¶ 29] Cox guided Participant 1 through the process of setting up the account and Cox told him to conceal that he, Cox, was the one trading the account and that it had been funded with money from other investors. [Ex. 3 ¶ 30, 31; Ex. 2 at 225:8-23; Ex. 1 Ex. A ¶ 29] Participant 1 had no knowledge about how to trade and relied entirely upon Cox to make the trades (giving Cox his username and password for the trading account) and to report to him how the trading account was faring. [Ex. 3 at ¶ 30; Ex. 2 at 234:16-25; 238 at 19-21; Ex. 1 Ex. A ¶¶ 35, 36] Thereafter, additional investments from Participant 1 and the other pool participants were sent to J. Cox's or Smart Edge's bank accounts or Participant 1's trading account. [Ex. 1

To conceal the fraud, Cox continued to send Pool Participants false pool performance emails and false statements for bank and trading accounts showing grossly exaggerated balances.

[Ex. 1 ¶¶ 40-48; Ex.1-Ex. A. ¶¶ 40, 42, 43, 44, 53, 57; Ex. 3 ¶ 25; Ex. 2 at 183:15-184:2 (Ex. 1-Ex. P (Dep Exs. 33 & 5)); 190:13-191:8 (Ex. 2 after p. 191 (see attached Dep. Exs. 34 & 35)); 251:5-253:11; 239:1-241:20; 242:15-245:10 (Ex. 1 – Exs. N & H (Dep. Exs. 52 & 53))]

Participant 1 shared some of the information in these false statements with the other pool participants. [Ex. 1 ¶ 40; Ex. 3 ¶40; Ex. 1 Ex. A ¶ 26]  For instance, in October 2020, Cox sent Participant 6 a false bank statement dated October 15, 2020 showing that a $485,000 wire transfer was sent from the account on October 7, 2020.  [Ex. 1 ¶ 48; Ex. 2 at 251:5-253:16]

     Through this scheme, Cox misappropriated pool participant funds.  He used participant funds, deposited into several different bank accounts, for his personal expenses (dining, online purchases, rent payments and personal loan repayments, for example).  The sum of funds that Cox personally retained was $339,300.  [Ex. 1 ¶¶ 29, 32, 36, 37, 38 and Tables 2, 3, 4 and 5] Cox also traded some participant funds and lost most of those funds through trading in accounts in which neither the Pool nor Pool Participants had any ownership interest and through his trading which he was enjoined from doing.  The total trading losses was $313,185. [Ex. 1 ¶ 23] In addition, the sum of $58,182 was overpaid to one pool participant. [Ex. 1 ¶ 25]  The total amount of misappropriated funds, which is the amount of participant funds deposited into the pool, less the amounts of participant withdrawals, which leaves a net amount of principal owing to participants of $710,667.  [Ex. 1 ¶39 and Table 6] [Ex. 3 ¶ 33]

     Cox's scheme began to unravel in the fall of 2020 when Participant 1 told Cox that he and the other pool participants wanted to withdraw the profits from their investment, as it had been sold to them by Cox as having only a six-month investment term.  [Ex. 1-Ex. A ¶ 52; Ex. 3 ¶¶ 35, 42]  In response, on September 6, 2020, Cox sent an email to Participant 1 with a false statement showing a purported balance in Participant 1's trading account of more than $1.3

9

million. [Ex. 1-Ex. A ¶ 53; Ex. 3 ¶ 44] Throughout the fall of 2020, Cox continued to make promises to Participant 1 that the payments to him and the other participants would be made. However, by December 2020, with no payments forthcoming, Participant 1 contacted the trading firm to ask about his account. The trading firm told Participant 1 that his account had a zero balance, with all funds either having been withdrawn or lost trading. [Ex. 1-Ex. A ¶ 55] Over the life of the account, a total of $478,600 had been deposited into Participant 1's trading account and $313,185 was lost through trading. [Ex. 1 ¶¶ 19, 23] Participant 1 did not confront Cox with the information he received from the trading firm and, thereafter, Cox continued to make excuses to Participant 1 and the other pool participants as to why he could not return their funds. In January 2021, Cox sent Participant 1 a false statement from Wells Fargo Bank showing a transfer of $281,000 in the name of Smart Edge. [Ex. 1 ¶¶ 46, 47 and Ex. Q] This statement was false in that Smart Edge did not even have an account at Wells Fargo. [Ex. 1 ¶ 47; Ex. 2 at 93:15-97:10]

In January 2021, Participant 1 asked Cox to send him a statement showing that the profits that he had reported to the participants in 2020 were accurate. Cox responded by emailing Participant 1 a statement dated January 8, 2021 from the trading firm showing a balance of $1,389,091.26. [Ex. 1 ¶ 44, Ex. 1-Ex. A ¶ 57] Participant 1 immediately knew that the January 8, 2021 statement was false since his account had been closed in November 20202 and had a zero balance on January 8, 2021. [Ex. 3 ¶ 38; Ex. 2 at 263:2-18; Ex. 1 Ex. O] When confronted with this obviously fabricated account statement during his deposition, Cox admitted that he was just trying to buy time with the participants when he sent it to Participant 1:

> Q:   Do you recall preparing this for [Participant 1]?
> Cox: Honestly, I do not.
> Q:   That's a pretty significant disparity, is it not, between a $1.3 million balance and a zero balance.
> Cox: Yes, it is.
> Q:   And your purpose in sending this false statement to [Participant 1] was what?

> Cox: Honestly, more than likely to try to buy time to figure out things. That's the only thing I can think of.

[Ex. 2 at 264: 7-17]

### 3. Cox Committed Violations of the Commodity Exchange Act and Commission Regulations

**(a) COUNT I**

7 U.S.C. § 6b(a)(1)(A) and (C) make it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person: (A) to cheat or defraud or attempt to cheat or defraud the other person;… or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for the other person. [Ex. 3 ¶ 47] As detailed above, Cox made misrepresentations of material fact and knowingly omitted disclosures of material facts to pool participants and misappropriated funds received from pool participants for his personal use. The statements and omitted facts here (false reports of profits, account balances, and false claims about many successful years of past trading experience) were material. A statement or omitted fact is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R&W Tech. Servs., Ltd. v. CFTC*, 205 F. 3d 165, 169 (5th Cir. 2000). Further, Cox acted with the requisite scienter in that he knew these unreasonable omissions or representations that he made to pool participants were false. "Scienter requires 'highly unreasonable omissions or misrepresentations . . . that present a danger of misleading [customers] which is either known to the Defendant[s] or so obvious that

Defendant[s] must have been aware of it.'" *CFTC v. Next Financial Services Unlimited,* S.D. Fla. No. 04-80562-CIVRYS, (Mar. 30, 2006), 2006 WL 889421, citing *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F. 3d 1321, 1328 (11th Cir. 2002) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F. 3d 1194, 1202 (11th Cir. 2001). Cox's conduct constitutes violations of Section 4b(a)(1)(A) and (C) of the Commodity Exchange Act, 7 U.S.C. § 6b(a)(1)(A), (C). [Ex. 3 ¶¶ 48, 49]

**(b) COUNT II**

7 U.S.C. § 6b(a)(1)(B) makes it unlawful for any person, in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person. . . "willfully to enter or cause to be entered for the other person any false record." [Ex. 3 ¶ 51] Cox committed fraud by: (i) making false reports and statements including by issuing false account statements showing Cox's profitable trading of pool participant funds, (ii) sending fabricated screen shots of Cox's alleged profitable trading activity and overstated account balances to pool participants; (iii) sending false reports via email concerning the alleged profitable trading of pool participant funds when the account was never profitable; and (iv) sending a false bank confirmation statement that purported to show a funds' transfer to Participant 1 although no funds were ever transferred to him. [Ex. 3 ¶¶ 52, 53]

**(c) COUNT III**

7 U.S.C. § 6*o*(1), in relevant part, makes it unlawful for CPOs, and their associated persons, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (A) to employ any device, scheme, or artifice to defraud any participant; or (B) to engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any participant. As provided in Regulation 4.15, 17 C.F.R. § 4.15 (2022), 7 U.S.C. § 6*o*(1)

applies to all CPOs and their associated persons, whether registered, required to be registered, or exempted from registration. [Ex. 3 ¶ 56]  Cox violated 7 U.S.C. § 6*o*(1)(A)-(B) by providing false information and statements reporting false profits to pool participants, by misappropriating participants' funds and by failing to disclose to pool participants his felony fraud and theft convictions in Florida in 2013 and the permanent commodity trading ban imposed upon him as a result of the CFTC's 2016 lawsuit.  [Ex. 3 ¶¶ 57, 58]

### (d) COUNT IV

7 U.S.C. § 6m(1) makes it unlawful for any CPO to make use of the mails or any means or instrumentality of interstate commerce in connection with its business unless it is registered with the CFTC. [Ex. 3 ¶ 60] Cox acted as a CPO within the meaning of Section 1a(11) of the Act, 7 U.S.C. § 1a(11), and Regulation 1.3, 17 C.F.R. § 1.3 (2022), and violated 7 U.S.C. § 6(m)(1) by using the mails or other means or instrumentalities of interstate commerce in connection with his business as a CPO without being registered with the Commission as a CPO. [Ex. 3 ¶¶ 5, 61, 62]

## IV.     RELIEF SOUGHT

**A.     The Court Should Permanently Enjoin Cox from Future Violations**

Unlike private actions which are rooted in the equity jurisdiction of the federal court, Commission suits for injunctive relief are creatures of statute.   The injunctive relief contemplated in Section 6c of the Act is remedial in nature, and is designed to prevent injury to the public and deter future illegal conduct.  Therefore, restrictive concepts ordinarily associated with private litigation, such as proof of irreparable injury or inadequacy of other remedies are inapplicable.  *CFTC v. Hunt,* 591 F. 2d 1211, 1220 (7th Cir. 1979).  7 U.S.C. § 13a-1(a) empowers the CFTC to seek permanent injunctive relief whenever it appears to the CFTC that

any person or entity "has engaged, is engaging, or is about to engage in any act or practice that violates the Act or Regulations," *Hunt*, 591 F. 2d at 1220. The "ultimate test" for entry of an injunction under the Act "is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *CFTC v. Siegel*, No. 13-5755 (NLH/JS)2014 WL 7404537, at *9 (D.N.J. Dec. 30, 2014) (quoting *CFTC v. Wilshire Inv. Mgmt. Corp.,* 531 F. 3d 1339, 1346 (11th Cir. 2008)). (Future violations of the Act or Regulations "may be inferred, or even presumed, from past unlawful conduct, and the absence of proof to the contrary." *CFTC v. Am. Metals Exch. Corp.,* 693 F. Supp. 168, 171 (D.N.J. 1988) (citing *Hunt*, 591 F. 2d at 1220); *CFTC v. Omega Knight 2, LLC,* No. 18-22377-Civ-Scola, 2019 WL 6796128 (S.D. Fla. Sept. 16, 2019) quoting from *SEC v. Mgmt. Dynamics, Inc.*, 515 F. 2d 801, 807 (2d Cir. 1975): "past illegal conduct is highly suggestive of the likelihood of future violations." *See, also, CFTC v. Investors Freedom Club, Inc.,* No. 8:03-DV54T16TGW, 2005 WL 940897 (M.D. Fla. Apr. 4, 2005) (a permanent injunction was entered where: defendants' actions were egregious and there was a high degree of scienter, the illegal activities were not isolated incidents, and defendants continue to deny any wrongdoing).

The nature of Defendant Cox's unlawful conduct makes it highly likely that he will be a repeat violator unless permanently restrained by this Court. This is not a case where Cox solicited pool participants and traded pool participants' funds in good faith but simply failed to achieve profitability. Rather, Cox knew that he did not have a successful and lengthy track record as a commodity futures trader when he solicited participants and then misappropriated . Moreover, the most compelling argument that Cox will be a repeat violator is that he is already a recidivist. Before launching the current fraud scheme, Cox had previously been found liable for fraud after the CFTC sued him for fraudulently soliciting clients for his trading services for

14

managed commodity futures accounts and losing virtually all of the client funds he had solicited. *CFTC v. Cox*, S.D. Fla. No. 16-60226-civ-ZLOCH. Then, as now, Cox tried to conceal his losing trading by distributing false daily account statements and screen shots showing false profits to his clients and this fraud scheme continued until it unraveled because the participants wanted to withdraw their profits. Cox also knew that he did not have the trading expertise he was telling prospective pool participants that he had.

**B.     Additional Injunctive Relief is Warranted**

This Court should invoke its discretion under Section 6c(c) of the Act, 7 U.S.C. § 13a-1(c), to again impose a permanent trading ban against Defendant Cox, prohibiting him from trading for himself and others because he has repeatedly committed core violations of the Act, by fraudulently soliciting 14 public customers as participants in his commodity pool and misappropriating their invested funds. Despite the fact that this broad permanent injunctive relief has previously been entered against Cox [Ex. 4 at p. 23], which order Cox completely disregarded, the Court should again grant that relief as it is warranted by Cox's conduct. Numerous courts have upheld permanent trading bans and injunctions broadly prohibiting "commodity-related activity." *CFTC v. Wilshire Inv. Mgmt. Corp.,* 531 F. 3d 1339 (11th Cir. 2008) (holding that the district court did not abuse its discretion in broadly prohibiting defendants from engaging in any commodity-related activity); *CFTC v. Omega Knight 2, LLC at *13* (when considering relief sought by the plaintiff seeking a default judgment, the court held that permanent registration and trading bans were warranted in the face of defendants' numerous false statements to customers and misappropriation of customer funds).

C. **Cox Should be Ordered to Pay Disgorgement**

This Court should order Cox to disgorge the monetary benefits of his unlawful activity. "District courts have the power to order disgorgement as a remedy for violation of the Act for 'the purpose of depriving the wrongdoer of his ill-gotten gains and deterring violations of the law." *CFTC v. American Metals Exchange Corp.*, 991 F. 2d 71, 76 (3rd Cir. 1993) (citing *CFTC v. British Am. Commodity Corp.,* 788 F. 2d 92, 94 (2d Cir. 1986). When ordering disgorgement, the amount should be equal to the extent of the defendants' unjust enrichment. *CFTC v. Levy,* 541 F. 3d 1102, 1113 (11th Cir. 2008). It is also immaterial in the determination of this sum whether the defendant has the ability to pay the amount of the disgorgement. *SEC v. Warren,* 534 F. 3d 1368, 1370 n. 2 (noting that '[a] contrary rule would allow con artists to escape disgorgement liability by spending their ill-gotten gains.")

The sum of $339,300 that the Commission requests as its disgorgement figure, to be paid by Defendant Cox, represents his profits as measured by the sums paid by the pool participants that were directly deposited or transferred into one of several bank accounts he owned or controlled. None of these participant funds were used to trade futures; rather, they were used by Cox to pay personal expenses. [Patrick Dec. ¶¶    ] The Commission, however, requests that any disgorgement amount collected here be distributed to Defendant's defrauded customers. *See SEC v. Fischbach Corp.*, 133 F. 3d 170, 175-76 (2nd Cir. 1997) and *SEC v. Cavanagh, et al.*, 445 F. 3d 105, 117 (2nd Cir. 2006).

D. **Restitution**

Section 6c(d)(3)(A) of the Act, 7 U.S.C. § 13a-1(d)(3)(A) (2012), permits the Commission to seek equitable remedies for violations of the Act, including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such

16

losses).″ Courts calculate restitution "as the difference between what Defendants obtained and the amount customers have already received back." *CFTC v. Ross*, No. 09-c-5443, 2014 WL 6704572, at *3 (N.D. Ill. Nov. 26, 2014). *See also CFTC v. Leben*, No. 14-cv-866, 2016 WL 7354359, at *9 (D.S.C. Aug. 5, 2016) ("restitution is determined by calculating the total amount of funds solicited from victims of the fraud by a defendant, less any funds returned to the victims by defendant.")

Financial records establish that Defendant Cox owes the sum of $710,667 to participants. Participants deposited a total of $865,467 to one of several bank accounts as ultimately directed by Cox for investment into the Cox pool. A total of $154,800 was paid back to participants, leaving a principal balance of $710,667 owing to participants. [Patrick Dec. ¶ 39 and Table 6]

**E.    Civil Monetary Penalty**

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1)(2012), and Regulation 143.8(a)(4)(ii)(B), 17 C.F.R. § 143.8(a)(4)(ii)(B)(2022), authorize the Commission to seek a civil monetary penalty ("CMP") of triple Defendant's monetary gain from each violation of the Act or Regulations, or $180,714 per violation, whichever is greater. The Court is "free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent." *CFTC v. Trimble,* No. 11-cv-2887, 2013 WL 317576, at *9 (C.D. Colo. Jan. 28, 2013) (citing *Miller v. CFTC,* 197 F. 3d 1227, 1236 (9th Cir. 1999). There are several factors to consider in assessing a civil monetary penalty, including: the relationship of the violation at issue to the regulatory purposes of the Act, and whether or not the violations involved core provisions of the Act; whether or not scienter was involved; the consequences flowing from the violative conduct; financial benefits to a defendant; and harm to customers or the market. *CFTC v. Noble Wealth Data Info Servs.*, 90 F. Supp. 2d 676, 694 (D. Md, 2000); *In re Grossfeld*, [1996-1998 Transfer

Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC Dec. 10, 1996), *aff'd*, 137 F. 3d 1300 (11th Cir. 1998). Civil monetary penalties should "reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future violations," which means that civil monetary penalties should make it financially detrimental to a defendant to fail to comply with the Act and Regulations so that the defendant would rather comply than risk violations. *Grossfeld* ¶ 26,921 at 44,467-8. *See, also, CFTC v. Smithers,* No. 9:12-cv-81165 (KAM), 2013 WL 4851684 at *12 (S.D. Fla. July 31, 2013) where the court noted that the "civil monetary penalty should be proportional to the gravity of the offenses committed" (holding that because the defendant knowingly made material misrepresentations to customers and misappropriated funds, that a civil penalty equal to triple the monetary gain should be imposed).

The Commission submits that a CMP of $1,017, 900 against Defendant Cox is appropriate due to the grave nature of his conduct which violated core anti-fraud provisions of the Act. Defendant Cox knowingly engaged in an illegal fraudulent scheme by fraudulently soliciting hundreds of thousands of dollars from pool participants who were seeking to invest in a commodity futures trading account that was to be traded by Cox; distributing false account statements to participants materially overstating trading profits and account balances; and misappropriating participant funds. Cox needs a substantial CMP to act as a deterrent given that he is a recidivist. The requested amount of $1,017,900 represents a sum that is triple Cox's monetary gain of $339,300.

**F.     Post-Judgment Interest**

The CFTC is entitled to post-judgment interest on any restitution and civil monetary penalty amounts ordered by this Court. 28 U.S.C. § 1961(a)(2012). Post-judgment interest

accrues at the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of judgment. *Id.*

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a)(2012), and pursuant to its own equitable powers, grant the CFTC's Motion for Entry of Default Judgment, pursuant to Fed. R. Civ. P. 55(b) and Local Rule 7.1(a)(1)(E), enter final judgment against Defendant Cox, and issue a final order in the form of the Proposed Order filed contemporaneously with this Motion, a copy of which has been delivered to the Court via email, that, *inter alia,* grants permanent injunctive relief, orders restitution and imposes an appropriate civil monetary penalty against Defendant Cox.

May 15, 2023

Respectfully submitted,

Attorneys for Plaintiff
Commodity Futures Trading Commission

By: */s/Susan B. Padove*
Senior Trial Attorney
(202) 390-6885
spadove@cftc.gov

David A. Terrell
Chief Trial Attorney
(312) 596-0539
dterrell@cftc.gov

Commodity Futures Trading Commission
77 West Jackson Blvd., Suite 800
Chicago, Illinois 60604

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RICO OMAR COX,<br><br>Defendant. | Case No: 0:22-cv-61024-SMITH/ MAYNARD |

CERTIFICATE OF SERVICE

I, hereby certify that on May 15, 2023, I electronically filed the foregoing **PLAINTIFF CFTC'S MOTION FOR FINAL JUDGMENT UPON DEFAULT, AND APPLICATION FOR A PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANT RICO OMAR COX,** using the CM/ECF system.

I further certify that I caused a copy of the foregoing document to be served on the Defendant VIA U.S. Mail and electronic mail as identified below:

Rico Omar Cox 1641 SW 4th Avenue
Fort Lauderdale, FL 33315
Roc86nwfeon@hotmail.com

                                                       By: */s/Susan B. Padove*
                                                       Susan B. Padove
                                                       Senior Trial Attorney
                                                       (202) 390-6885
                                                       spadove@cftc.gov


                                                       Commodity Futures Trading Commission
                                                       77 West Jackson Blvd.,
                                                       Chicago, Illinois 60604